Leah C. Schwartz
Wyo. Bar. No. 7-5019
RANCK & SCHWARTZ, LLC
20 E. Simpson Avenue
Jackson, WY 83001
(307) 733-5130
leah@ranckschwartz.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| AMERICAN WILD HORSE CAMPAIGN, | ) |
| | ) |
| ANIMAL WELFARE INSTITUTE, | ) |
| | ) |
| WESTERN WATERSHEDS PROJECT, | ) |
| | ) |
| CAROL WALKER, | ) |
| | ) |
| KIMERLEE CURYL, | ) |
| | ) |
| and | ) |
| | ) |
| CHAD HANSON, | )    Civ. No. _____ |
| | ) |
| *Petitioners*, | ) |
| | ) |
| v. | )    **PETITION FOR REVIEW OF** |
| | )    **FINAL AGENCY ACTION** |
| TRACY STONE-MANNING, Director, | ) |
|   U.S. Bureau of Land Management, | ) |
| | ) |
| and | ) |
| | ) |
| DEB HAALAND, Secretary, | ) |
|   U.S. Department of Interior, | ) |
| | ) |
| *Respondents*. | ) |

## <u>INTRODUCTION</u>

1.      This case challenges the Bureau of Land Management's ("BLM's") formal

amendments to the Green River and Rawlins Resource Management Plans ("RMPs"), and the

associated Environmental Impact Statement ("EIS"), governing wild horse management in the agency's Rock Springs and Rawlins Field Offices, Wyoming. The amendments affect four Herd Management Areas ("HMAs")—areas established for the maintenance of wild horses and burros based on defined factors that determine their capacity to sustain wild horse and burro herds. Through the RMP amendments, BLM authorized the permanent elimination of two of those HMAs (and the wild horses found therein) and a drastic boundary and wild horse population reduction in a third HMA. In practical terms, the RMP amendments entail the eradication of at least 1,200 wild horses that Congress explicitly protected through the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), 16 U.S.C. §§ 1331-1340, due to the fact that wild horses existed on these public lands when Congress enacted the statute in 1971. Even using BLM's conservative estimates—i.e., even if BLM maintains these HMAs at the highest end of the agency-approved population range—the decision would leave very few wild horses in the planning area, equating to roughly one wild horse for every 2,297 acres of BLM-managed public land in those areas.

2.      This case represents yet another in a line of BLM decisions determined to stamp out wild horses in the Wyoming Checkerboard, an area where federal and non-federal lands are interspersed with one another. But as with its prior attempts, BLM simply lacks the authority under the Wild Horse Act to accomplish its aim here. According to the agency, its RMP amendments and EIS are necessary because managing wild horses in the Wyoming Checkerboard (which only comprises a portion of these HMAs) is "difficult," and preparing the EIS allows BLM to comply with a Consent Decree it entered into with the Rock Springs Grazing Association ("RSGA"), an organization whose members graze domestic livestock on BLM lands (at heavily subsidized prices) in competition with wild horses for forage. Yet as BLM concedes,

that Consent Decree merely obligated BLM to "*consider*" the environmental impact of a similar plan; it did "not *require* that the BLM implement any specific action." BLM, *Wild Horse Management for the BLM Rock Springs and Rawlins Field Offices: Proposed Resource Management Plan Amendment and Final Environmental Impact Statement* at 13 (emphasis added) [hereinafter "FEIS" or "Final EIS"]. Nor could it. BLM itself has consistently recognized that wild horses may be removed from public land only once they have been labeled "excess animals"—meaning there are insufficient quantities of habitat factors, such as forage, water, cover, and space, to support the existing herd size in a "thriving natural ecological balance . . . in that area." 16 U.S.C. § 1332(f). But BLM did not make that determination here. Instead, the agency freely admits that its decision is predicated on extraneous factors outside of BLM's discretion to consider when managing wild horses. Thus, the proposed amendments, if implemented, are textbook arbitrary action under the Wild Horse Act and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706.

3.      For similar reasons, the agency's EIS, ostensibly prepared to satisfy BLM's duties under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, is also fatally flawed. By relying on vague or unexplained rationales, the agency's NEPA analysis rejects from detailed consideration reasonable alternatives that entail fewer environmental impacts and ignores several important facets of the agency's decision, thereby concealing the full extent of environmental impacts stemming from the RMP amendments. These errors demonstrate that BLM has not used the NEPA process to inform its decision-making, as the Act is intended, but instead to justify a decision it has already made.

4.      The RMP amendments and BLM's environmental analysis mark a fundamental shift in the way the agency manages wild horses. If allowed to stand, they would set a dangerous

precedent that would allow BLM to remove wild horses from public lands whenever the agency

finds their management obligations "difficult," or when they fear wild horses might eventually

stray onto nearby private land. For these reasons, as explained further below, BLM has violated

the Wild Horse Act, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§

1701-1787, NEPA, and the APA.

## JURISDICTION

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question).

## PARTIES

6.      Petitioner American Wild Horse Campaign ("AWHC") is a national nonprofit

organization dedicated to preserving wild horses in viable free-roaming herds for generations to

come, as part of this country's national heritage. AWHC's grassroots efforts are supported by a

coalition of over 60 historic preservation, conservation, horse advocacy, and animal welfare

organizations. Supporters of AWHC and partner coalition organizations enjoy (and plan to

continue) viewing wild horses on public lands, including in the White Mountain, Great Divide

Basin, Salt Wells Creek, and Adobe Town HMAs, for observation, photography, recreational,

and educational purposes. On behalf of its supporters, AWHC also regularly submits comments

on various BLM actions related to the management of wild horses, such as decisions to modify

HMA boundaries, to adjust population levels within HMAs, and to authorize the permanent

removal of wild horses from the public range.

7.      AWHC was the lead petitioner in two previous lawsuits in this Court that

successfully challenged BLM's unlawful wild horse removals from the Adobe Town, Salt Wells

Creek, and Great Divide Basin HMAs, which culminated in the Tenth Circuit's favorable ruling

in *Am. Wild Horse Preservation Campaign v. Jewell*, 847 F.3d 1174 (10th Cir. 2016) [hereinafter "*Jewell*"]. Subsequently, AWHC was the lead petitioner in a lawsuit challenging BLM's reinterpretation of the Wild Horse Act that would allow it to permanently remove non-excess wild horses from the range; this Court ruled in Petitioners' favor by finding BLM's renewed attempt to remove non-excess wild horses arbitrary and capricious. *See* Order Vacating Excess Horse Determination at 10, *Am. Wild Horse Campaign v. Zinke*, No. 17-cv-00170 (D. Wyo. Jan. 19, 2019) (Freudenthal, J.), ECF 66. Now, for the fourth time, AWHC is the lead petitioner in challenging BLM's newest attempt to circumvent the Wild Horse Act by removing non-excess wild horses from these HMAs.

8.      Petitioner Animal Welfare Institute ("AWI") is a national, nonprofit charitable organization founded in 1951, dedicated to alleviating the suffering inflicted on animals by humans. AWI engages policymakers, scientists, industry professionals, non-governmental organizations, farmers, veterinarians, teachers, and the public in its broad animal protection mission. AWI works to minimize the impacts of all human actions that are detrimental to wildlife, including by mitigating the use of inhumane methods to manage free-roaming wild horses and burros. AWI has been involved with issues pertaining to the treatment of wild equines since the 1950s.  In 1959, AWI's legislative division was instrumental in the passage of the Wild Horse Annie Act (P.L. 86-234), which prohibited the poisoning of wild horse and burro waterholes, as well as the use of motorized vehicles to round the horses up for sale to slaughterhouses.  In 1971, AWI's founder testified in support of the Wild Free-Roaming Horses and Burros Act. In 2012, AWI presented a 377-page report entitled "Overview of the Management of Wild Horses and Burros" to the National Academy of Sciences Committee to Review the Management of Wild Horses and Burros. And on behalf of its members, AWI

regularly submits comments on BLM decisions that affect wild horses, including decisions that lead to the removal of wild horses from public lands. Members of AWI enjoy (and plan to continue) viewing wild horses on public lands, including in the White Mountain, Great Divide Basin, Salt Wells Creek, and Adobe Town HMAs, for observation, photography, recreational, and educational purposes.

9.      Petitioner Western Watersheds Project ("WWP") is a nonprofit corporation with over 12,000 members and supporters, and field offices in seven western states, including Wyoming. WWP is dedicated to protecting and restoring watersheds and wildlife in the American West through education, public policy initiatives, and legal advocacy. WWP and its members have longstanding interests in improving public lands management, including the management of wild horses, and maintaining a thriving natural ecological balance throughout the western United States. On behalf of its members, WWP regularly submits comments on BLM actions related to the management of wild horses, including during the resource management planning process and amendments to RMPs, like that at issue here. WWP members enjoy (and plan to continue) viewing wild horses on public lands, including in the White Mountain, Great Divide Basin, Salt Wells Creek, and Adobe Town HMAs, for observation, photography, recreational, and educational purposes. WWP submitted comments on BLM's Draft EIS for the proposed RMP amendments, and then formally protested BLM's Amendment. BLM denied WWP's protest on November 30, 2022.

10.      Petitioner Carol Walker is a photographer with significant professional and personal interests in Wyoming's wild horse herds. She has spent her career photographing wild horses, particularly horses exhibiting wild and natural behaviors on the range. She sells fine art prints, calendars, and books of her photographs of wild horses engaging in their natural

behaviors. Ms. Walker has been visiting BLM lands to view wild horses all across Wyoming several times per year since 2004, including all of the HMAs at issue in this case and many public lands located within the Wyoming Checkerboard. Given her long-standing familiarity with these herds, Ms. Walker can easily identify many of these horses and has named some of them based on repeated interactions. A book of Ms. Walker's photographs was published in France in 2014, titled *Mustang: The Heart of an American Legend*. She is also the author of the books *Wild Hoofbeats: America's Vanishing Wild Horses* and *Galloping to Freedom: Saving the Adobe Town Appaloosas*. She also recently published a coffee table book called: *Blue Zeus: Legend of the Red Desert*.

11.     Ms. Walker was a named Petitioner in the prior three lawsuits that led this Court or the Tenth Circuit to invalidate BLM's attempts to remove non-excess horses from these HMAs. Along with AWHC, Ms. Walker submitted comments on BLM's Draft EIS for the proposed RMP amendments on April 30, 2020, and formally protested BLM's Amendment on June 6, 2022. BLM denied Ms. Walker's protest on November 30, 2022. Ms. Walker is also a member of Petitioner WWP, which, as explained, submitted detailed comments on the Draft EIS and a separate protest letter.

12.     Petitioner Kimerlee Curyl is a professional photographer whose work focuses on capturing the raw beauty of wild horses running free across their rugged native terrain. She has photographed wild horses extensively in Wyoming, including in the White Mountain, Little Colorado, Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs. Fine art prints of her photographs have been sold in galleries throughout the nation and featured in several advertising and product branding campaigns for clients such as Carivintas Winery, 14 Hands Winery, Archer Hotels, and Road Ranger L.L.C. Some of her best-selling works were captured in the Great

Divide Basin and Salt Wells HMAs. In addition to her professional interest in wild horses, Ms. Curyl derives immense personal satisfaction from viewing wild horses in the Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs, which continue to be her favorite places to photograph and observe horses. Her profound desire to learn and educate others about wild horses has served as the driving force behind her work, which she uses to educate members of the public about the importance of protecting wild horses and their habitat.

13.    Ms. Curyl was a named Petitioner in the prior three lawsuits that led this Court or the Tenth Circuit to invalidate BLM's attempts to remove non-excess horses from these HMAs. Along with AWHC, Ms. Curyl submitted comments on BLM's Draft EIS for the proposed RMP amendments on April 30, 2020, and formally protested BLM's Amendment on June 6, 2022. BLM denied Ms. Curyl's protest on November 30, 2022. Ms. Curyl is also a member of Petitioner WWP, which, as explained, submitted detailed comments on the Draft EIS and a separate protest letter.

14.    Petitioner Chad Hanson serves as Director of the Wyoming Mustang Institute, a nonprofit committed to using research and education as means to ensure viable wild horse populations on public land. In partnership with Casper College and the Osher Lifelong Learning Institute, Hanson also teaches a popular course called "The Wild Horse Experience." The course includes field-based education in Wyoming's mustang herd management areas. In addition, Dr. Hanson is the author of *In a Land of Awe: Finding Reverence in the Search for Wild Horses* (Broadleaf Books, 2022) and his photographs of mustangs have appeared in both juried and solo exhibitions. For the sake of research, publication, photography, and education, Dr. Hanson regularly visits the White Mountain, Great Divide Basin, Salt Wells Creek, and Adobe Town HMAs, and he will continue to do so during the course of, and after, this litigation.

15.     Dr. Hanson submitted detailed comments on BLM's Draft EIS for the proposed RMP amendments on April 30, 2020, and formally protested BLM's Amendment on June 6, 2022. BLM dismissed Hanson's protest on November 30, 2022. Dr. Hanson is also a member of AWHC, which, as explained, submitted comments on the Draft EIS and a separate protest letter.

16.     The legal violations alleged in this Petition, traceable directly to BLM's conduct, cause concrete injury to the aesthetic, conservation, recreational, scientific, educational, historic, cultural, and wildlife preservation interests of Petitioners and their members, including by reducing their opportunities to view, and/or adversely affecting the behavior of, the wild horses that Petitioners and their members enjoy observing, conserving, and otherwise benefiting from, including on public lands regularly visited by Petitioners and their members, including public lands where BLM is proposing to permanently eradicate all wild horse use. Petitioners' actual, concrete interests have been, are currently being, and, absent relief from this Court, will continue to be adversely and irreversibly injured by BLM's failure to comply with federal law. Relief from this Court, including vacatur of the challenged decisions pending full compliance with the Wild Horse Act, FLPMA, NEPA, the APA, and other legal requirements, will remedy Petitioners' injuries.

17.     Respondent Tracy Stone-Manning is the Director of BLM, which is an agency or instrumentality of the United States within the Department of Interior. Director Stone-Manning is responsible for overseeing BLM's management of various public lands and waters, including the HMAs governed by the RMP amendments, and has the responsibility to ensure that the agency's management of public lands and resources complies with the Wild Horse Act, NEPA, FLPMA, and the APA. Respondent Stone-Manning is sued solely in her official capacity.

18.     Respondent Deb Haaland is the Secretary of the U.S. Department of Interior and is ultimately responsible for overseeing the work of BLM, a constituent agency within the U.S. Department of Interior. She is sued solely in her official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     The Wild Free-Roaming Horses and Burros Act and FLPMA

19.     In 1971, Congress enacted the Wild Horse Act out of concern that wild horses were "disappearing from the American scene." 16 U.S.C. § 1331. Declaring that "wild horses are living symbols of the historic and pioneer spirit of the West," and "contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress directed those wild horses "shall be protected from capture, branding, harassment, [and] death" and "be considered in the area where presently found, as an integral part of the natural system of the public lands." *Id.* To implement that mandate, Congress declared that BLM shall "protect and manage wild free-roaming horses and burros as components of the public lands," and provided that "[a]ll management activities shall be at the minimal feasible level." *Id.* § 1333(a).

20.     Under the Act, BLM manages wild horses on public lands within HMAs, which are "established for the maintenance of wild horse . . . herds," 43 C.F.R. § 4710.3-1, in the areas they were present in 1971. 43 C.F.R. § 4700.0-5(d). BLM designates HMA boundaries in RMPs, which are prepared through a land-use planning process conducted pursuant to FLPMA, 43 U.S.C. §§ 1701-1787. FLPMA's implementing regulations require BLM to maintain RMPs that are "designed to guide and control future management actions" on public lands. 43 C.F.R. § 1601.0-2. Modifications to HMA boundaries may be adopted only through this land-use planning process, which requires extensive public involvement and compliance with NEPA. *See Id*. § 4710.1; *see also* BLM, Wild Horses and Burros Management Handbook H-4700-1 ("*Wild Horse*

10

*Handbook*"), at 8 (decisions to modify "an HMA must be made through a [land use plan] amendment, revision or new RMP").

21.     The Wild Horse Act further requires BLM to manage wild horses "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). To do so, for each HMA, BLM must: (1) maintain a current inventory of wild horses in each HMA, (2) "determine [the] appropriate management level"—i.e., the "AML"—of wild horses that the HMA can normally sustain, and (3) determine the method of achieving the designated AML and managing horses within it. 16 U.S.C. § 1333(b)(1); 43 C.F.R. §§ 4710.2, 4710.3-1. An AML is "expressed as a population range within which [wild horses] can be managed for the long term" in an HMA without resulting in rangeland damage. BLM, *Wild Horse Handbook* at 17. The lower limit of the AML range is "established at a number that allows the population to grow (at the annual population growth rate) to the upper limit over a 4-5-year period, without any interim gathers." *Id.* BLM establishes an AML for each HMA through the formal process created by FLPMA, when developing or amending the applicable RMP. *See* BLM, *Wild Horse Handbook* at 18.

22.     Section 3 of the Wild Horse Act grants BLM the authority to manage and protect wild horses by permanently removing "excess" horses from public lands, but only after BLM specifically determines that: (1) "an overpopulation [of wild horses] exists on a given area of the public lands," and (2) "action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2). An "excess" wild horse is defined as one that "must be removed from an area *in order to preserve and maintain a thriving natural ecological balance . . .* in that area." *Id.* § 1332(f) (emphasis added). Once BLM makes a formal "excess determination," it may remove only those "excess animals from the range so as to achieve appropriate management levels." *Id.* §

1333(b)(2). According to BLM's wild horse manual, "[w]ild horses or burros should generally not be removed below the AML lower limit." BLM, *Wild Horse Manual* MS-4720, at 4 (July 7, 2010), https://on.doi.gov/3z8FMwm; *see also* BLM, *Wild Horse Handbook* at 17 (wild horse removals should be conducted to "maintain population size within AML"). Removal of wild horses below the agency's legally established AML may be warranted only "in emergency situations based on limited forage, water or other circumstances." BLM, *Wild Horse Manual* at 5. Before taking action to remove wild horses below AML if BLM determines that emergency circumstances exist, BLM must conduct an adequate NEPA analysis subject to public participation and provide a compelling "[r]ationale to justify a reduction below the AML lower limit." *Id.*

23.     In contrast to Section 3's broad authority to permanently remove excess horses from public land in order to protect wild horse populations and other range resources, Section 4 of the Act provides BLM with the narrow authority to remove wild horses from private land when "the owners of such land . . . inform [BLM]" that a wild horse has "stray[ed] from public lands onto privately owned land." 16 U.S.C. § 1334 (emphasis added). This narrow authority is generally triggered by a "written request from the private landowner," 43 C.F.R. § 4720.2-1, at which point BLM must "arrange to have the animals removed." 16 U.S.C. § 1334.

24.     In contrast to wild horses that have a statutory right under the Wild Horse Act to be protected on and to use public lands where they existed in 1971 (and to be subjected to the "minimal feasible" management by BLM on those lands), Congress took a very different approach with respect to domestic livestock in the Taylor Grazing Act. Under that law, domestic livestock may graze federal public lands as a privilege only where BLM concludes in its "discretion" that such use is appropriate in light of other uses of those public lands. 43 U.S.C. §

315. Because Congress has already determined the relative priority of federally protected wild horses compared to domestic livestock on public lands—conferring a statutory right to wild horses but merely a discretionary privilege to domestic livestock when it does not conflict with other uses of those public lands—BLM's implementing regulations authorize BLM to "close appropriate areas of the public lands to grazing use by all or a particular kind of livestock" if BLM determines such action is "necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury . . . ." 43 C.F.R. § 4710.5. BLM's regulations do not contain any similar authority to close public lands to wild horses to provide habitat for or to otherwise benefit domestic livestock.

### B. The National Environmental Policy Act

25. NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[1] At the most basic level, NEPA is intended to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens *before* decisions are made and before actions are taken." *Id.* § 1500.1(b)-(c) (emphasis added).

26. The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—is charged with administering NEPA, and has promulgated

---

[1] The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), followed by a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15,618 (Apr. 25, 1986). More recently, CEQ published a new rule, effective September 14, 2020, which further revised the 1978 regulations. However, the NEPA analysis challenged here arose prior to the 2020 amendments and are therefore governed by the 1978 regulations, as amended. *See* FEIS at 1-4 n.1. Thus, Petitioners cite throughout to the regulations as previously codified at 40 C.F.R. Parts 1500-1508.

regulations implementing the Act that are "binding on all federal agencies." *See id.* § 1500.3; *see also id.* §§ 1500-1508.

27.     Under NEPA, federal agencies are required to consider the potential environmental impact of *all* agency actions. 42 U.S.C. §§ 4321-4347. The touchstone of NEPA is the EIS; federal agencies must prepare an EIS for any "major Federal action significantly impacting the quality of the human environment." *Id.* § 4332(c). An EIS ensures that all potentially significant environmental effects have been considered and disclosed to the public *during* the decision-making process. 40 C.F.R. §§ 1501.2, 1502.5.

28.     Within the EIS itself, federal agencies must identify and disclose all direct, indirect, and cumulative impacts of the proposed action, consider a reasonable range of alternative actions and their potential impacts, and disclose all irreversible and irretrievable commitments of resources attributable to the action. 42 U.S.C. § 4332(2). CEQ has deemed the alternatives analysis "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

29.     The agency's identification and disclosure of all potential impacts (and the alternatives thereto) are commonly referred to as the agency's duty to take a "hard look" at the environmental impacts of its decision. The three kinds of effects ordinarily discussed in an EIS are "direct effects," "indirect effects," and "cumulative impacts." 40 C.F.R. §§ 1502.16, 1508.7,

1508.8.[2] "Direct effects" are those "caused by the action and occur at the same time and place." *Id.* § 1508.8(a). "Indirect effects" are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative impacts are those which "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.

30.     NEPA also requires consideration in an EIS of multiple types of actions, including "connected actions" and "cumulative actions." *Id.* § 1508.25(a). "Connected actions" are those that "are closely related and therefore should be discussed in the same impact statement"; actions are connected if they: (i) "Automatically trigger other actions which may require environmental impact statements"; (ii) "Cannot or will not proceed unless other actions are taken previously or simultaneously"; or (iii) "Are interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1508.25(a)(1). "Cumulative actions" are those that when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." *Id.* § 1508.25(a)(2).

31.     To fully explain the potential effects of alternatives in an EIS, NEPA requires federal agencies to evaluate all "appropriate mitigation measures" adopted to alleviate identified impacts from the proposed action, and identify any additional "[m]eans to mitigate adverse environmental impacts." *Id.* §§ 1502.14(f); 1502.16(h).

---

[2] "Effects and impacts as used in [NEPA's implementing] regulations are synonymous." 40 C.F.R. § 1508.8.

C.     **The Administrative Procedure Act**

32.     Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

33.     When reviewing agency action under the APA, the court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

## FACTUAL BACKGROUND

A.     **The Adobe Town, Salt Wells Creek, Great Divide Basin, and White Mountain Herd Management Areas**

34.     The RMP amendments at issue in this case concern four HMAs in southern Wyoming—the Adobe Town, Salt Wells Creek, Great Divide Basin, and White Mountain HMAs. Three of the four HMAs fall within the Red Desert, one of the nation's largest remaining blocks of public land that is predominantly unfenced and in a natural condition. The Red Desert has historically been known for having some of the nation's largest wild horse herds and best wild horse viewing opportunities for the public.

35.     The Adobe Town HMA is jointly managed by BLM's Rawlins and Rock Springs Field Offices. It encompasses 476,986 acres, of which 442,428 acres (i.e., 92.8%) are federal, BLM-administered, public lands. The relatively small portion of the HMA that is non-federal land is interspersed with federal land in a continuously alternating checkerboard pattern of parcels that are approximately one-mile squares. However, the vast majority of the HMA (i.e., 91% of the total HMA) consists of a large, solid block of federal land that spans 434,057 acres. *See infra* Fig. 1 (HMA Map).

36.     Because the Adobe Town HMA spans both the Rawlins and Rock Springs Field Offices, it is managed by both offices pursuant to the 2008 Rawlins Resource Management Plan ("Rawlins RMP") and the 1997 Green River Resource Management Plan ("Green River RMP"), respectively. The total AML for the Adobe Town HMA—which is the number of wild horses BLM allows in this HMA, consistent with a thriving natural ecological balance of these public lands—is 610-800 wild horses (445-565 wild horses in the Rawlins portion and 165-235 wild horses in the Rock Springs portion).

37.     The Salt Wells Creek HMA is managed by BLM's Rock Springs Field Office under the Green River RMP. It encompasses 1,169,739 acres, of which 689,961 acres (i.e., 59%) are federal, BLM-administered, public lands. A large portion of the HMA consists of the checkerboard pattern of federal and non-federal land described above—i.e., a continuously alternating pattern of federally and non-federally owned parcels of approximately one-mile by one-mile squares. The remaining portion of the HMA (i.e., 28% of the total HMA) consists of a solid block of federal land that spans 327,527 acres. Under the Green River RMP, the AML for the Salt Wells Creek HMA—which BLM has determined as the population range this HMA can

sustain without threatening the thriving natural ecological balance of these public lands—is 251-365 wild horses.

38.     The Great Divide Basin HMA is managed by BLM's Rock Springs Field Office under the Green River RMP. It encompasses 776,189 acres, of which 559,398 acres (i.e., 72.1%) are federal, BLM-administered, public lands. The majority of the Great Divide Basin HMA (i.e., 52% of the total HMA) is a solid block of federal public land that spans 403,618 acres; the remainder consists of a continuously alternating pattern of federally and non-federally owned parcels of approximately one-mile by one-mile squares. Under the Green River RMP, the AML for the Great Divide Basin HMA—which BLM has determined as the population range this HMA can sustain without threatening the thriving natural ecological balance of these public lands—is 415-600 wild horses.

39.     The White Mountain HMA is managed by BLM's Rock Springs Field Office under the Green River RMP. It encompasses 388,488 acres, of which 228,527 acres (i.e., 58.8%) are federal, BLM-administered, public lands. The majority of this HMA consists of a continuously alternating checkerboard pattern of federally and non-federally owned parcels of approximately one-mile by one-mile squares; the remainder of the HMA (i.e., 28% of the total HMA) is a 108,776-acre solid block of federal public land. Under the Green River RMP, the AML for the White Mountain HMA is 205-300 wild horses.

40.     In total, these four HMAs encompass 2,811,402 acres, of which 1,920,314 acres (i.e., 68.3%) are federal, BLM-administered, public lands. Of these, 1,273,978 acres of federal, BLM-administered, public lands are contained within large contiguous solid blocks of federal public lands (rather than a checkerboard pattern)—constituting 66.3% of the total federal public land in these HMAs and 45.3% of the total land (public or private) in these HMAs.



*Fig. 1: Map of Planning Area for BLM's Amendments to the Rawlins and Green River RMPs*

**B.    The Rock Springs Grazing Association and the 2013 Consent Decree**

41.    RSGA, an organization whose members graze livestock that compete with wild horses for forage on BLM-administered public lands, owns or controls portions of the private checkerboard lands within the Adobe Town, Salt Wells Creek, Great Divide Basin, and White Mountain HMAs. RSGA has a grazing permit from BLM authorizing, in the agency's discretion, RSGA's members to graze the alternating sections of public land within the checkerboard portions of these HMAs.

42.    After years of disagreements with BLM about what RSGA perceived as a failure to timely remove excess wild horses from both the public and private lands within these HMAs, RSGA filed a lawsuit in 2011 to compel BLM, pursuant to Section 4 of the Wild Horse Act, to "remove all of the wild horses that have strayed onto the RSGA lands within the Wyoming Checkerboard." Petition for Review, *Rock Springs Grazing Ass'n v. Salazar*, No. 2:11-cv-263935, F. Supp. 2d 1179 (D. Wyo. 2013), ECF No. 1. As explained in its Petition for Review, RSGA filed suit because it was informed by the Assistant Secretary for the Department of Interior that "litigation would be necessary to secure additional funding for wild horse gathers." *Id.* at ¶ 70.

43.    BLM and RSGA ultimately reached a settlement, signing a consent decree on February 12, 2013 ("Consent Decree") that required BLM, *inter alia*, to gather wild horses from private lands within the checkerboard, as required by Section 4 of the Act; "consider appropriate changes" to the HMA boundaries that included lands owned or leased by RSGA; and "consider revision of the respective numbers of wild horses as expressed by AMLs." *Rock Springs Grazing Ass'n v. Salazar*, 935 F. Supp. 2d 1179, 1185 (D. Wyo. 2013). For its part, RSGA agreed to allow "up to 205 to 300 wild horses" to reside on its lands within the White Mountain HMA,

"subject to the BLM's agreement to institute fertility control measures and to keep the numbers to the lower range of the agreed-upon numbers." *Id.*

44.     The Consent Decree contains a number of provisions designed to ensure BLM's compliance with the Wild Horse Act. For instance, Paragraph 17 provides that "[n]o provision of this Consent Decree shall be interpreted or constitute a commitment or requirement that [BLM] take actions in contravention of the [Wild Horse Act], FLPMA, NEPA, the APA." Likewise, Paragraph 10 reiterates that "[n]othing in this Consent Decree shall be construed to limit or modify the discretion accorded to BLM by the applicable federal law and regulations . . . or general principles of administrative law with respect to the procedures to be followed in carrying out any of the activities required herein."

45.     Over Petitioners' objections, the Court approved the Consent Decree on April 3, 2013. *Salazar*, 935 F. Supp. 2d at 1191. Citing Paragraph 10, the Court found that it "expressly prohibits any construction which would 'limit or modify the discretion accorded to BLM by the applicable federal law and regulations.'" *Id.* at 1189. Thus, the Court explained, the AMLs for the identified HMAs "are not changed by the Consent Decree," and compliance with NEPA and the Wild Horse Act is required before any such change may occur. *Id.* In this sense, the Consent Decree did not "on its face violate law or public policy." *Id.* at 1191. "[W]hether the Consent Decree actually limits the BLM's discretion will turn on the implementation and force of the Decree, which is unclear at this juncture," the Court explained. *Id.* at 1189.

**C.     Whether the Consent Decree actually limits the BLM's Subsequent Roundup, Ensuing Litigation, and the Tenth Circuit's Decision in *Jewell***

46.     Shortly after the Consent Decree was approved, BLM announced its plan to round up and permanently remove excess wild horses from the Great Divide Basin HMA. *See generally* BLM, Public Scoping Notice for 2014 Wild Horse Gather (Dec. 10, 2013). At the

behest of RSGA, however, BLM suddenly changed course, opting instead to "gather all wild horses from the checkerboard within the [Adobe Town, Salt Wells Creek, and Great Divide Basin] HMAs"—a decision that BLM alleged was "required by Section 4 of the [Wild Horse Act] and the Consent Decree." BLM, Decision Record for Removal of Wild Horses from Checkerboard Lands at 4 (July 18, 2014). "[I]n discharging its duties under Section 4 of the [Wild Horse Act]," BLM acknowledged that it would be removing wild horses from "the public land portions of the checkerboard"—without ever invoking or analyzing the agency's Section 3 duties concerning wild horse management on *public* land. *Id.* at 3.

47.     Petitioners challenged BLM's decision in this Court in 2014 on Wild Horse Act, NEPA, and FLPMA grounds. After the Court denied Petitioners' request for preliminary injunctive relief, BLM rounded up and removed 1,263 wild horses from the public and private lands of the checkerboard, leaving all of the HMAs far below their associated AMLs.

48.     On the merits, Petitioners argued that BLM's decision to remove wild horse from the *public* portions of the checkerboard—without making an "excess determination"—violated the plain language of Section 3 of the Wild Horse Act. *See Am. Wild Horse Preservation Campaign v. Jewell*, No. 2:14-cv-152, 2015 WL 11070090 (D. Wyo. March 3, 2015) (Freudenthal, J.). The Court sided with BLM, concluding that BLM reasonably interpreted Section 4 to authorize removals from the public portions of those HMAs that are interspersed with non-federal lands in a checkerboard pattern. *Id.* at *8 ("[T]he Court concludes BLM reasonably exercised its discretion in interpreting Section 4 to authorize the 2014 roundup from the checkerboard without a Section 3 excess determination which would mandate a return of horses, even though the result of the roundup is that the [populations] are below the [AML] low range."). The Court's conclusion was premised, in part, on the difficulty BLM encounters when

managing wild horses in the Checkerboard. *See id.* at *7 (declining to require BLM to make an excess determination where "[t]he free-roaming horses would simply stray back to RSGA's checkerboard, triggering another request, another removal, and so on").

49.     On appeal to the Tenth Circuit, Petitioners renewed their argument that BLM impermissibly exercised its Section 4 authority when gathering wild horses from the *public* portions of the Checkerboard. *See Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1186-87 (10th Cir. 2016). The Tenth Circuit agreed, concluding that "there is simply no ambiguity in the terms 'public lands,' 'privately owned land,' and 'private lands' that are utilized in Sections 3 and 4 of the Act, and in turn no basis for BLM to construe the terms 'privately owned land' and 'private lands' to include the public land sections of the Checkerboard." *Id.* at 1188. The Tenth Circuit explained that while "BLM can, as part of a Section 4 gather, also remove wild horses from adjacent public land parcels, . . . in doing so, it must abide by the plain terms of Section 3," including by determining that an overpopulation exists within a given HMA and ensuring that only "excess" horses are permanently removed from the range. *Id.* Thus, because BLM did not adhere to Section 3 before removing wild horses from public lands, the agency "violated the duties that Section 3 clearly imposes on it with respect to wild horses found on the public land sections of the Wyoming Checkerboard." *Id.* at 1189.

50.     In reaching its holding, the Tenth Circuit acknowledged the difficulties involved in managing wild horses on the Wyoming Checkerboard and questioned whether "the solution can come in the form of amendments to the areas designated as HMAs, and/or to the AMLs applicable to the HMAs at issue." *Id.* at 1189 n.8. However, even that proposal, the Tenth Circuit recognized, "may have little effect" and observed that "the ultimate solution must come from Congress." *Id.*

51.     Following remand from the Tenth Circuit, the Court entered judgment in favor of Petitioners on all of their claims. BLM cancelled its roundups in the Checkerboard that had been slated to occur in November 2016.

**D.     BLM's 2017 Roundup and Petitioners' Subsequent Letter Regarding the Wyoming Checkerboard**

52.     In March 2017, mere months after the Tenth Circuit's ruling in *Jewell*, BLM announced that it was again planning to roundup wild horses in the Wyoming Checkerboard. Having had its most recent attempt rejected by the Tenth Circuit, this time BLM reimagined which horses were considered "excess animals" under the Wild Horse Act. Whereas the agency previously counted both adult horses *and* dependent foals when projecting the number of horses that would need to be removed, in 2017 (at the behest of RSGA), BLM suddenly decided that only adult horses counted towards that total. For BLM, this meant it could remove both those "excess" adult horses *and* their dependent offspring, thereby allowing the agency to permanently remove more than 400 horses in addition to those properly deemed "excess animals" as required by Section 3 of the Wild Horse Act. In other words, BLM adopted a new roundup approach to accomplish the same objective as the previous roundup rejected by the Tenth Circuit—i.e., removing more horses from public lands in these HMAs than allowed by the Wild Horse Act.

53.     Petitioners filed suit, seeking injunctive relief to halt the roundup and challenge BLM's reinterpretation of the Wild Horse Act. *See* Petition for Review, *Am. Wild Horse Campaign v. Zinke*, No. 17-cv-00170 (D. Wyo. Oct. 6, 2017), ECF 1. Although the Court again denied Petitioners' injunction request, it ultimately sided with Petitioners on the merits, finding that BLM's decision to conceal from the public "the maximum number of *all* wild horses that would be subject to authorized removal" was arbitrary and capricious. *See* Order Vacating

Excess Horse Determination at 10, *Am. Wild Horse Campaign v. Zinke*, No. 17-cv-00170 (D.

Wyo. Jan. 19, 2019), ECF 66. Thereafter, the Court entered judgment in Petitioners' favor.

54.     On April 28, 2017, AWHC and others endeavored to help BLM officials find

"pragmatic solutions to the longstanding problems in the Wyoming Checkerboard concerning

land management and user conflicts." *See* Letter from William S. Eubanks II, on behalf of

AWHC, et al., to Michael Nedd, Acting Director, BLM, et al. at 6 (Apr. 28, 2017). In particular,

AWHC encouraged BLM to explore "public-private land exchanges to further the goals and

objectives of both the agency (on behalf of the public) and private landowners in an effort to

alleviate management constraints." *Id.* at 2. As AWHC explained then, such exchanges have

been "frequently extended to 'checkerboard' land management schemes throughout the western

United States, in an effort to consolidate certain lands and reduce user conflicts among the

private and public uses of adjacent parcels within a checkerboard land pattern." *Id.* at 3. As

Petitioners pointed out, BLM has succeeded in resolving checkerboard conflicts in Utah by

relying on land swaps. On information and belief, BLM did not respond to Petitioners' letter.

### E.     BLM's Proposed RMP Amendments and Draft EIS, and Petitioners' Comments

55.     In January 2020, BLM announced that it was considering amendments to the

Green River and Rawlins RMP targeting wild horse populations on the Wyoming Checkerboard.

The agency issued a combined Draft RMP Amendment and EIS, which cites the "2013 Consent

Decree" and "RSGA's withdrawal of consent to maintain wild horses on privately-owned lands"

as some of the driving needs for the amendment. *See* BLM, *Draft RMP Amendment and EIS for

Wild Horse Management in the Rock Springs and Rawlins Field Offices, Wyoming* at 10 (Jan.

2022) [hereinafter "Draft EIS" or "DEIS"].

56.     According to the Draft EIS, the Consent Decree requires the agency to "consider the environmental effects of revising the respective RMPs for the Rock Springs and Rawlins Field Offices," including, specifically:

- Changing the Salt Wells Creek HMA to a Herd Area, which would be managed for zero wild horses, and if the BLM determines there are more than 200 wild horses within the herd area, the area would be re-gathered to zero wild horses;

- Changing the Great Divide Basin HMA to a Herd Area, which would be managed for zero wild horses, and if BLM determines there are more than 100 wild horses within the Herd Area, the area will be re-gathered to zero wild horses;

- Changing the Adobe Town HMA AML to 225-450 wild horses or lower, and that gathered wild horses will not be returned to the Salt Wells Creek area; and

- Managing the White Mountain HMA as a non-reproducing herd by utilizing fertility control and sterilization methods to maintain a population of 205 wild horses and to initiate gathers if the population exceeds 205 wild horses.

*See* DEIS at 9.

57.     The Draft EIS sets out four alternatives for consideration. The first, "Alternative A," is the agency's "No Action Alternative," whereby no changes would be made to either the Green River or Rawlins RMPs. Under this alternative, BLM would continue to "manage wild horses within these four HMAs at a total AML of 1,481 to 2,065." DEIS at 15. Under this alternative, "[f]encing would only be constructed when multiple-use values would be enhanced, and would be built to minimize restriction of wild horse movement." Similarly, fertility control measures would only be employed "when necessary."

58.     "Alternative B," envisions "maintaining the same number of wild horses within the planning area while adjusting HMA boundaries to exclude most checkerboard lands," which would "revert to HA status and be managed for zero wild horses." *Id.* The only exception is the White Mountain HMA, which would retain its checkerboard portions on the condition that BLM manage the herd there as a "non-reproducing" one, "using various population growth

26

suppression methods, including, but not limited to: gelding, spaying, or other mechanical, surgical, or chemical means." *Id.* at 15-16. According to BLM, "[t]his alternative responds, in part, to the Consent Decree's requirement that the BLM consider and analyze the possibility of managing the White Mountain HMA as non-reproducing." *Id.* at 16.

59.     "Alternative C" proposes to remove all wild horses from the planning area, and all four HMAs "would revert to HA status and be managed for zero wild horses." *Id.* According to BLM, "[t]his alternative responds, in part, to requirements of the Consent Decree (i.e., analysis of converting the Salt Wells Creek and Great Divide Basin HMAs to Herd Areas and managing them for zero wild horses, and managing the Adobe Town HMA at 450 wild horses or less)." *Id.*

60.     The fourth alternative, "Alternative D," is BLM's "Preferred Alternative" and therefore embodies the proposed amendments to the Green River and Rawlins RMPs. Here, BLM proposes to remove all checkerboard lands from the four HMAs, with those portions reverting to HA status. Additionally, "all other lands in three of the HMAs"—i.e., massive solid blocks of land adjacent to checkerboard lands—would *also* revert to HA status. Following that change, "[a]ll HA lands would be managed for zero wild horses." *Id.* at 16. BLM summarizes the changes proposed by this alternative as follows:

- The [Rock Springs] portion of the Adobe Town HMA would revert to HA status and be managed for zero wild horses. In the [Rawlins] portion of the HMA, all checkerboard land and the portion of the HMA north of the existing Corson Springs southern allotment boundary fence (see Map 2-3) would revert to HA status and be managed for zero wild horses. The remainder of the HMA (within the RFO) would be retained and managed with an AML of 259 – 536.

- The entire Great Divide Basin HMA would revert to HA status and be managed for zero wild horses.

- The entire Salt Wells Creek HMA would revert to HA status and be managed for zero wild horses.

- The entire White Mountain HMA would revert to HA status and be managed for zero wild horses.

*Id.* The only remaining HMA, albeit in severely reduced form, would be the Adobe Town HMA, which would have its AML cut from 610-800 down to 259-536.[3] Because it is BLM's practice to gather and remove wild horses to "low AML," adoption of BLM's Preferred Alternative likely means the number of wild horses in all four HMAs will plummet from 1,481-2,065 down to 259. According to BLM, "[t]his alternative responds, in part, to the requirements of the Consent Decree by analyzing an alternative where the Salt Wells Creek and Great Divide Basin HMAs revert to Herd Areas and are managed for zero wild horses." *Id.* at 17.

61.     After laying out the four alternatives, the Draft EIS attempts to justify BLM's selection of Alternative D as its "Preferred Alternative." *See id.* at 17-19. Despite claiming to provide "a detailed description of the rationale for the Preferred Alternative by HMA," BLM's explanation omitted any discussion of the motivation behind stripping the checkerboard lands of their HMA status, or BLM's statutory authority to redesignate those areas as Herd Areas based on considerations unrelated to whether they support a thriving natural ecological balance ("TNEB")—i.e., the standard Congress imposed in the Wild Horse Act. Instead, BLM went to great lengths to justify its decision to also remove the HMA designations from the solid block portions of each HMA. With respect to the Great Divide HMA, for instance, BLM conceded there is "adequate forage, water, cover and space to sustain a wild horse herd in the solid-block portion of this HMA"; nevertheless, BLM explained, the "entire HMA would revert to HA status and be managed for zero wild horses" because "it would be very difficult for BLM to prevent

---

[3] Remarkably, BLM's "Preferred Alternative" is even more draconian than RSGA's proposal in the 2013 Consent Decree, in which RSGA had no objection to up to 450 horses in the Adobe Town HMA and up to 205 horses in the White Mountain HMA (i.e., up to 655 horses in total).

this herd from continually returning to private lands in the checkerboard." *Id.* at 18. BLM's

explanation, however, failed to explain how such "difficulty" squares with the Wild Horse Act's

prohibition against removing wild horses that have not been deemed "excess animals." *See id.*;

*see also* 16 U.S.C. §§ 1332-1333.

62.     With respect to the Salt Wells Creek HMA, BLM again conceded "that there

would be adequate forage, water cover and space to sustain a wild horse herd, and maintain a

TNEB within the solid-block portion of the HMA." DEIS at 18. Still, "the solid-block portion

also would revert to HA status [and be managed for zero wild horses] under this alternative due

to the infeasibility of creating an effective barrier between checkerboard and solid-block federal

lands." *Id.*[4]

63.     The same logic governs the changes in the Adobe Town HMA. Even though a

minority of the Rock Springs portion of that HMA consists of a checkerboard pattern, BLM

again relied on the hypothetical possibility of horses straying onto private land to justify its

decision to strip this portion of its HMA status and zero out the wild horse population. As to the

Rawlins portion, BLM acknowledged that it is "meeting all land health standards" and that there

is "adequate forage, water cover and space to sustain a wild horse herd" under the "No Action"

Alternative. *Id.* at 17-18; *see also id.* at App'x A.

64.     Even though RSGA "consented to wild horses utilizing private land within [the

White Mountain HMA]," so long as the herd is managed as a "non-reproducing" one, in the

Draft EIS, BLM opted instead to simply redesignate the entire HMA as an HA that is "managed

---

[4] Notably, the alleged "infeasibility" of creating effective barriers is undermined by the Draft
EIS's later discussion of grazing allotments, where BLM acknowledges that "[n]umerous range
improvements (such as fences or water developments) have been installed within the planning
area to help manage livestock distribution and season of use, while protecting sensitive riparian
habitat." *Id.* at 54.

for zero wild horses . . . due to the potential interchange of reproducing animals from outside the HMA." *Id.* at 19.

65.     The Draft EIS also included a brief summary of alternatives that were *not* analyzed by BLM. These included managing the Wyoming Checkerboard as an HMA that excludes the *private* portions of the Checkerboard; and managing the solid-block portions of the White Mountain HMA in conjunction with the Little Colorado HMA. Both were rejected as infeasible due to the potential for wild horse interchange between public and private lands. *See* DEIS at 19.

66.     All of the Petitioners timely submitted comments in response to the proposed RMP amendment and Draft EIS. In those comments, Petitioners objected to, *inter alia*, BLM's use of extra-statutory factors (such as the potential for wild horses to stray onto private land) to justify the conversion of HMAs to Herd Areas managed for zero wild horses. Similarly, Petitioners pointed out that because BLM did not determine "there is an overpopulation of horses," removing "non-excess horses from the range [would] violate the Wild Horse Act, its implementing regulations, and the APA." *See* AWHC Comments on DEIS at 13; *see also* WWP Comments on DEIS at 1-4 (explaining that an "[excess horse] determination cannot be made for any wild horse in the [four] HMAs, because BLM has rendered a determination that a 'thriving natural ecological balance' currently is maintained under present wild horse populations in these HMAs").

67.     Petitioners' comments also identified a number of concerns with BLM's NEPA analysis (or lack thereof), including its evaluation of alternatives. For example, both AWHC and WWP pointed out that BLM had once again failed to consider consolidation of checkerboard lands through public-private land exchanges, as AWHC asked it to in 2017. AWHC Comments

on DEIS at 25-26; WWP Comments on DEIS at 16. Nor had the agency considered an alternative in which BLM eliminated (or even reduced) grazing authorizations within the various HMAs to minimize the number of horses that must be permanently removed. *See*, *e.g.*, AWI Comments on DEIS at 8-9; *see also* WWP Comments on DEIS at 16-17 (encouraging BLM to consider an alternative in which "all domestic livestock were removed from these HMAs").[5]

68.    Petitioners also pointed out that BLM failed to disclose information necessary to enable meaningful NEPA comments and analysis. For example, despite BLM's assertion that "RSGA's withdrawal of consent to maintain wild horses on privately-owned lands" is the driving impetus behind the RMP amendments, *see* DEIS at 10, BLM never discloses "that less than 1/3 of the checkerboard is owned [or leased] by RSGA." WWP Comments on DEIS at 5; *see also* AWI Comments on DEIS at 6; AWHC Comments on DEIS at 23. Petitioners also pointed out that the Draft EIS failed to disclose any "estimate of current populations of wild horses for each HMA, or an accounting of recent population trends and how they have been affected by past roundups"—which is, of course, necessary to take a "hard look" at wild horse management alternatives. *E.g.*, WWP Comments on DEIS at 10. Nor did the Draft EIS disclose which "population management tools" the agency will actually employ under any of BLM's alternatives, which, as Petitioners explained, is a prerequisite to understanding the scope of effects on the herds in these HMAs. *See* AWHC Comments on DEIS at 16-17; AWI Comments on DEIS at 10-19.

---

[5] To the contrary, as Petitioners observed, the Draft EIS indicates that BLM may actually *expand* the amount of livestock grazing in these HMAs. *See* AWI Comments on Draft EIS at 8, 5 (AUMs "previously allocated to wild horse use may be reallocated to wildlife, livestock" (quoting Draft EIS at 5)).

**F.     BLM's Final Proposed Amendments, Final EIS, and Response to Comments**

69.     On May 6, 2022, BLM published its proposed RMP Amendment and Final EIS. The Final EIS remained materially the same as the Draft EIS, save for minor changes to Alternative B made "to better align with the requirements of the 2013 Consent Decree" and one change regarding the agency's "Preferred Alternative," Alternative D. *See* FEIS at 18-19. In the latter, BLM decided that it would not alter the boundary of the White Mountain HMA and would maintain the AML of 205-300 horses. BLM also decided against managing the White Mountain herd as "non-reproducing" in favor of employing more aggressive "population growth suppression strategies . . . to reduce the overall population growth rate for this herd." *Id.* at 18-19.[6] However, BLM again failed to identify which specific "population growth suppression strategies" it plans to employ, instead deferring that analysis to future implementation.

70.     As to the "purpose and need" for the proposed RMP amendments, BLM again reiterated that its decision is driven by the 2013 Consent Decree. *Id.* at 10 ("The need for this plan amendment is the result of a change in consent for the use of private lands within the checkerboard portion of these HMAs."); *see also* Draft EIS at 3 (highlighting "RSGA's withdrawal of consent to maintain wild horses on its privately-controlled lands, as embodied in the 2013 Consent Decree"). As such, BLM admits that "the analysis in this document *does not* focus on whether existing range conditions reflect a [TNEB] as described in the [Wild Horse

---

[6] BLM's reversal of position regarding White Mountain is striking. Although BLM states that a significant portion of the Adobe Town HMA, and the entire Great Divide Basin and Salt Wells Creek HMAs will "revert to HA status and be managed for zero wild horses" to "prevent wild horses who had historically utilized the checkerboard lands from drifting out of the solid-block portion of this HMA," FEIS at 22, 23, it simultaneously concedes that implementing "population growth suppression strategies" in the White Mountain HMA—which contains 72% checkerboard land (the most of any of the HMAs)—is legally and practically sufficient to obviate any change to its HMA status. *See Id.* at 22-24. However, BLM never reconciles these opposing positions in the FEIS or elsewhere.

Act].” FEIS at 13 (emphasis added); *see also id.* at App'x A (revealing that all four HMAs *currently* contain sufficient forage, water, cover, and space—i.e., the constituent elements used to determine TNEB, *Wild Horse Handbook* at 59—to support the existing herd sizes).

71.     In all, the Final EIS's “Preferred Alternative” (i.e., proposed RMP amendments) reveals that the agency plans to slash the number of wild horses authorized in the four HMAs from 1,481-2,065 down to just 464-836, a 60-70% reduction. Even using BLM's high end of the proposed AML range under the proposed RMP Alternative of 836 horses, this would leave just 0.00044 wild horses per acre of federal public land in the action area under BLM's jurisdiction (or, alternatively, it would result in a ratio of nearly 2,300 acres of federal public land in the action area to one wild horse).

72.     In the Final EIS, BLM failed to provide any meaningful response to the concerns raised by Petitioners and others regarding the Draft EIS. FEIS at App'x C (Draft EIS Public Comments and BLM Responses). For example, in response to Petitioners' comments objecting to BLM's use of legally irrelevant factors to justify the conversion of HMAs to Herd Areas (and BLM's disregard of the factors Congress actually made relevant to this decision), BLM remained steadfast that it need not consider “current resource conditions on these HMAs.” *Id.* In response to Petitioners' comments pointing out BLM's failure to disclose specific population management tools, BLM claimed that such disclosure “is beyond the scope” of the Final EIS and will, instead, be addressed at a future date. Likewise, although BLM gave limited consideration in the Final EIS's Alternative B to a modest reduction in livestock grazing in portions of these HMAs, it did not consider more broadly whether to eliminate or at least reduce livestock grazing on all public lands in these HMAs or at least within the large BLM-administered solid public land blocks of these HMAs; in response to comments, BLM arbitrarily stated that “[c]onsideration of reducing

or eliminating livestock grazing from public lands is beyond the scope of this EIS." *Id.* This statement runs directly contrary to 43 C.F.R § 4710.5, which authorizes the agency to close wild horse HMAs to any or all classes of livestock to benefit wild horses.

73.     In response to Petitioners' comments regarding consideration of land exchanges to consolidate checkerboard lands pursuant to BLM's regulation in order to promote the protection of wild horses and their longstanding habitat as reflected in the Wild Horse Act, *see, e.g.*, 43 C.F.R. 2200.0-2, 2200.0-6, BLM added a single paragraph to the "Alternatives Considered but Eliminated from Detailed Analysis" section of the Final EIS. There, BLM claimed that this alternative was eliminated because "BLM does not currently have a proposal from a willing party (or group of parties) to a land exchange involving checkerboard lands in the planning area." FEIS at 25. BLM further alleged that "[e]ven if a proposal existed," it "would likely take years to complete," making it unresponsive to the agency's "purpose and need," which BLM suddenly defined as "resolv[ing] private land conflicts *in the near term*." *Id.* (emphasis added). BLM did not explain why it was incumbent on "a willing party (or a group of parties" to propose consolidation in the first instance, nor why BLM could not proactively initiate land swaps by contacting land owners within the Checkerboard to propose such exchanges. *See* 43 C.F.R. Part 2200 (authorizing BLM land exchanges). Nor did BLM explain why the agency had not taken any steps since 2017—when AWHC formally requested that BLM consider a land swap to address this very issue—to explore the possibility of a land swap and reach out to landowners about such a proposal. BLM also failed to explain why it decided to suddenly impose a new "near-term" parameter on its own purpose-and-need statement, especially when the Final EIS's own alternatives explicitly envision "long term" conditions within the HMAs. *See, e.g.*, FEIS at 20-21.

G.    **Petitioners' Protest and BLM's Protest Resolution Report**

74.    On June 6, 2022, Petitioners filed a formal protest of BLM's proposed RMP amendments in accordance with BLM's regulations implementing FLPMA, 43 C.F.R. § 1610.5-2.2, thereby exhausting Petitioners' administrative remedies.[7] Petitioners' protests renewed their objections to BLM's proposed RMP amendments and NEPA analysis, including the specific objections discussed above.

75.    On September 7, 2022, BLM completed a Protest Resolution Report for the amendments to the Green River and Rawlins RMPs. *See* BLM, *Director's Summary Protest Resolution Report: Wild Horse Management for the BLM Rock Springs and Rawlins Field Offices Proposed Resource Management Plan Amendment and Final Environmental Impact Statement (PRMPA/FEIS)* (Sept. 7, 2022) [hereinafter "Protest Report"].[8] The Protest Report states that BLM received 26 protests, of which only seven "had valid protest issues," according to BLM. *Id.* at iii.[9]

76.    After ostensibly considering the "valid" protests, including Petitioners', the Protest Report concludes that, in preparing the RMP amendments and Final EIS, BLM "followed the applicable laws, regulations, and policies and considered all relevant resource information and public input." *Id.* at 1. Hence, according to BLM, "no changes to the Proposed RMP [amendments] were necessary." *Id.*

---

[7] WWP submitted a separate protest letter on May 20, 2022 that renewed its objections to the RMP amendments, as outlined in its April 29, 2022 comments on the Draft EIS.

[8] Despite the Protest Report having been completed in September 2022, BLM did not notify Petitioners of the report until, at the earliest, December 12, 2022 (via letter dated November 30, 2022).

[9] The remaining protest letters were dismissed from consideration on technical or procedural grounds. *See* Protest Report at iii.

77.     The Protest Report also purports to respond to concerns raised by Petitioners and others during the protest period. Here again, though, BLM sidesteps explaining or identifying what authority the agency retains to disregard consideration of "whether existing range conditions reflect a TNEB as described in the [Wild Horse Act], or whether the wild horses are 'excess' horses that must be removed from the range" by instead relying on the "change in consent for the use of private lands within the checkerboard portion of these HMAs." *Id.* at 11-12. Nor does the Protest Report adequately explain why RSGA's alleged withdrawal of consent with respect to non-federal private checkerboard lands *also* drove BLM's management decision in the vast portions of solid-block federal public land that lie *outside* the Checkerboard.

78.     In response to concerns raised about BLM's NEPA analysis, the Protest Report largely regurgitates BLM's responses to comments on the Final EIS. It asserts, for instance, that Petitioners' concerns regarding the lack of necessary environmental information is beyond the scope of BLM's "land use planning-level decision," and that Petitioners' proposed alternatives were not responsive to the agency's artificial "purpose and need." *See e.g.*, *id.* at 16, 29.

**H.      BLM's Record of Decision and Approved RMP Amendment**

79.     On May 9, 2023, BLM issued a Record of Decision ("ROD") and Approved Resource Management Plan Amendment ("ARMPA"), accompanied by a news release and a "Dear Reader" letter.

80.     The news release and the "Dear Reader" letter confirmed both that the decision was motivated by the February 12, 2013 Consent Decree that BLM entered into with RSGA, and that BLM viewed the purpose of the decision—despite its much more far-reaching outcome that addressed non-checkerboard lands—as limited to addressing conflicts on checkerboard lands in these HMAs. *See* BLM, *News Release*: *Bureau of Land Management Updates Wild Horse*

*Management in Southern Wyoming* (May 9, 2023) ("*In response to a 2013 consent de[c]ree with the Rock Springs Grazing Association*, today the Bureau of Land Management Wyoming State Office issued a Record of Decision and approved Resource Management Plan Amendment for wild horse management within the Rock Springs and Rawlins Field Offices. The amended plan *resolves ongoing wild horse management conflicts between private and public land sections within the checkerboard land pattern*." (Emphasis added)); BLM, *Dear Reader Letter* (May 8, 2023) ("These Resource Management Plans were amended to address private land conflicts with wild horse management in an area commonly referred to as 'checkerboard land.'").

81.     The combined ROD and ARMPA adopted Alternative D from the FEIS, without any modifications to the decision in response to public protests. The ROD/ARMPA repeated the rationale for adopting Alternative D that was contained in the FEIS, and once again affirmed that wild horse use would be permanently eliminated from solid-block portions of certain HMAs even though those areas contain adequate forage, water, cover, and space to sustain a genetically viable wild horse herd while maintaining TNEB in these areas of public land. The only rationale for eliminating wild horse use from these areas is that wild horses might eventually stray onto RSGA's private lands located in the checkerboard lands outside the solid-block portions of these HMAs. Nowhere in the ROD/ARMPA did BLM address the possibility of closing all or any portion of these HMAs under BLM's administration to domestic livestock grazing in order to provide habitat to wild horses, as specifically contemplated by 43 C.F.R. § 4710.5. The ROD/ARMPA did not address several important facts and contentions raised in Petitioners' protests. Nor did the ROD/ARMPA address the fact that, by its terms, the February 12, 2013 Consent Decree had expired prior to BLM issuing its ROD/ARMPA, where the Consent Decree stated that it "shall terminate no later than ten years after entry of the decree."

## PETITIONERS' CLAIMS FOR RELIEF

### Claim 1 – Violations of the Wild Horse Act, FLPMA, and the APA

82.     All allegations set forth above are incorporated here by reference.

83.     By converting HMAs (and portions of thereof) to Herd Areas in the Green River and Rawlins RMPs based on factors that are legally irrelevant to whether those areas can support a "thriving natural ecological balance," BLM has violated the Wild Horse Act, 16 U.S.C. §§ 1331-1340, its own regulations and guidance interpreting the Wild Horse Act, 43 C.F.R. §§ 4700.0-1–4770.5, FLPMA, 43 U.S.C. §§ 1701-1787, and/or the APA, 5 U.S.C. § 706.

84.     By committing to designate AMLs for the various HMAs based on factors unrelated to whether those areas can support a "thriving, natural ecological balance" and/or "deterioration of the range," as instructed in BLM's *Wild Horse Handbook*, the RMP amendments violate the Wild Horse Act, 16 U.S.C. §§ 1331-1340, BLM's implementing regulations, 43 C.F.R. §§ 4700.0-1–4770.5, the agency's past practice and guidance, and the APA, 5 U.S.C. § 706.

85.     By ignoring the legally relevant factors contained in the Wild Horse Act, its implementing regulations, and BLM's guidance interpreting the Act in making its decisions to permanently eliminate or reduce wild horse use from certain public lands where wild horses were "to be considered in areas where presently found, to be an integral part of the natural system of the public lands," convert HMAs to Herd Areas, and to readjust AMLs for these public lands, the RMP amendments violate the Wild Horse Act, 16 U.S.C. §§ 1331-1340, FLPMA, 43 U.S.C. §§ 1701-1787, BLM's implementing regulations, 43 C.F.R. §§ 4700.0-1–4770.5, and/or the APA, 5 U.S.C. § 706.

86.     By committing to permanently remove wild horses from public lands without first determining that there exists an "overpopulation" of wild horses, that their removal is necessary to "achieve and maintain" TNEB on these public lands, that those wild horses are "excess animals" as defined by the Wild Horse Act and BLM's implementing regulations, and/or that an "emergency situation" exists, the RMP amendments violate the Wild Horse Act, 16 U.S.C. §§ 1331-1340, FLPMA, 43 U.S.C. §§ 1701-1787, BLM's implementing regulations, 43 C.F.R. §§ 4700.0-1–4770.5, and/or the APA, 5 U.S.C. § 706.

87.     By committing to permanently eliminate or reduce longstanding wild horse use from certain federal public lands, to convert HMAs to Herd Areas, and to adjust AMLs downward, BLM arbitrarily ignored the agency's authority in the Wild Horse Act and its implementing regulations to close public lands to domestic livestock grazing to support wild horse use, and exceeded its legal authority by permanently closing most of these public lands to wild horse use to support domestic livestock grazing, in violation of the Wild Horse Act, 16 U.S.C. §§ 1331-1340, FLPMA, 43 U.S.C. §§ 1701-1787, BLM's implementing regulations, 43 C.F.R. §§ 4700.0-1–4770.5, and/or the APA, 5 U.S.C. § 706.

## Claim 2 – Violations of NEPA and the APA

88.     All allegations set forth above are incorporated here by reference.

89.     By predicating its NEPA analysis on an artificial, manufactured "purpose and need"—i.e., "prevent[ing] wild horses from drifting onto checkerboard lands," FEIS at 22, and asserting that "private land conflicts" must be resolved "in the near term," *id.* at 25—and eliminating reasonable alternatives from consideration based thereon, and by failing to coherently explain why that purpose and need does not apply to the RMP amendment governing the White Mountain HMA, BLM's FEIS, the RMP amendments, and ROD, violate NEPA, 42

U.S.C. §§ 4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508, and the APA, 5 U.S.C § 706(2).

90.     By refusing to analyze reasonable alternatives proposed by Petitioners and others—including, *inter alia*, land swaps meant to consolidate lands and reduce management conflicts within the Wyoming Checkerboard, and/or cessation or reduction of livestock grazing in all or portions of the affected HMAs—and by failing to coherently explain why those alternatives were rejected from its analysis, BLM's FEIS (and the RMP Amendments that rely thereon) violates NEPA, 42 U.S.C. §§ 4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508, and is arbitrary and capricious, in violation of the APA, 5 U.S.C § 706(2).

91.     By failing to disclose, let alone consider, highly relevant information necessary to enable public participation in the environmental review process—including, *inter alia*, which "population growth suppression strategies" BLM plans to employ during its implementation of the RMP amendments, the actual inventory of wild horses and livestock present within each HMA, forage production data for the planning area, and the prospect for reductions and/or cessation of livestock grazing in the four HMAs (including in the solid-block public land portions of these HMAs)—the FEIS and the RMP amendments that rely thereon violate NEPA, 42 U.S.C. §§ 4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508, and the APA, 5 U.S.C. § 706.

92.     By refusing to consider and analyze numerous relevant issues and alternatives, and instead stating in BLM's response to comments that those issues and alternatives are beyond the scope of this FEIS and RMP amendment—without providing any coherent explanation for that assertion—the FEIS and RMP amendments violate NEPA, 42 U.S.C. §§ 4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508, and the APA, 5 U.S.C. § 706.

93.     By failing to address—let alone resolve—numerous internal inconsistencies in BLM's approach to various relevant issues in its FEIS, the FEIS and RMP amendments violate NEPA, 42 U.S.C. §§ 4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508, and the APA, 5 U.S.C. § 706.

94.     By failing to address in its ROD/ARMPA numerous issues raised in Petitioners' protest, BLM's ROD and ARMPA violate NEPA, 42 U.S.C. §§ 4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508, and the APA, 5 U.S.C. § 706.

95.     By failing to address the fact that the February 12, 2013 Consent Decree (which the Court approved on April 3, 2013) expired prior to BLM issuing its ROD/ARMPA, and by thereby failing to address whether BLM has any ongoing duty or legal authority to undertake this action, BLM's ROD and ARMPA violate NEPA, 42 U.S.C. §§ 4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508, and the APA, 5 U.S.C. § 706.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners respectfully request that this Court:

(1)     Declare that BLM's amendments to the Green River and Rawlins RMPs, and BLM's associated ROD, violate the Wild Horse Act, FLPMA and the APA;

(2)     Declare that BLM's FEIS prepared in conjunction with the amendments to the Rawlins and Green River RMPs, and ROD, violate NEPA and the APA;

(3)     Set aside and remand the amendments to the Green River and Rawlins RMP, the ROD, and the FEIS pending BLM's compliance with the Wild Horse Act, FLPMA, NEPA, and the APA;

(4)     Enjoin BLM from amending the Green River and Rawlins RMPs and/or removing wild horses from the impacted HMAs until the agency has fully complied with all of its obligations under the Wild Horse Act, FLPMA, NEPA and the APA;

(5)     Award Petitioners their attorneys' fees and costs; and

(6)     Grant Petitioners such other and further relief that the Court may deem is just and proper.

Respectfully submitted this 10th day of May, 2023.

*/s/ Leah C. Schwartz*
Leah C. Schwartz
Wyo. Bar. No. 7-5019
RANCK & SCHWARTZ, LLC
20 E. Simpson Avenue
Jackson, WY 83001
(307) 733-5130
leah@ranckschwartz.com

*/s/ William S. Eubanks II*
William S. Eubanks II
(Admission *pro hac vice* forthcoming)
EUBANKS & ASSOCIATES, PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
Phone: (970) 703-6060
bill@eubankslegal.com

*/s/ Matthew R. Arnold*
Matthew R. Arnold
(Admission *pro hac vice* forthcoming)
EUBANKS & ASSOCIATES, PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
Phone: (202) 656-3599
matt@eubankslegal.com

*Counsel for Petitioners*