# Exhibit B

*to*

Opening Merits Brief of
Petitioners American Wild Horse Campaign, Animal Welfare Institute, Western Watersheds Project, Carol Walker, Kimerlee Curyl, and Chad Hanson

✱✱✱✱✱

## Declaration of Suzanne Roy

✱✱✱✱✱

*American Wild Horse Campaign, et al. v. Tracy Stone-Manning, et al.*, No. 2:23-cv-00084-NDF

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| AMERICAN WILD HORSE CAMPAIGN, et al., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Petitioners, | | |
| v. | | Case No. 2:23-cv-00084-NDF |
| TRACY STONE-MANNING, et al., | | |
| Respondents. | | |

### DECLARATION OF SUZANNE ROY

I, Suzanne Roy, hereby declare as follows:

1. I am the Director of the American Wild Horse Campaign ("AWHC"), a national non-profit organization dedicated to protecting and preserving viable free-roaming herds of wild horses on public lands for future generations. AWHC is endorsed by a broad-based coalition of public interest groups, environmentalists, and humane organizations representing over ten million supporters.

2. AWHC and its supporters and coalition partners are dedicated to protecting and preserving wild horse and burro herds as intact viable populations. Our supporters enjoy viewing, studying, photographing, and filming wild horses and burros, including wild horses on those public lands located in or adjacent to the Wyoming Checkerboard, such as the Adobe Town, White Mountain, Great Divide Basin, Salt Wells Creek, and Little Colorado Herd Management Areas ("HMAs"). AWHC is engaged in multiple programs to ensure the survival of wild and free-roaming horse and burro herds in the West through educational and media initiatives, litigation, lobbying, advocacy campaigns, and habitat acquisition and preservation

initiatives. AWHC works with government agencies, including the Bureau of Land Management ("BLM"), to implement solutions for on-the-range management of wild horses and burros in their habitats with the goal of preventing captures and removals.

3. AWHC routinely participates in the administrative processes for agency actions affecting wild horses, including by consistently submitting comments on behalf of its members and supporters on decisions related to the management of wild horses. AWHC regularly submits comments and participates in the public processes that affect wild horses and burros on public lands in Wyoming specifically. AHWC has been extremely active in the Resource Management Plan ("RMP") revision process for the Green River and Rawlins RMPs (both of which cover portions of the affected HMAs, as well as the Wyoming Checkerboard that makes up a part of each HMA), including by submitting multiple rounds of comments and a formal protest to BLM's final decision, which calls for the eradication of thousands of wild horses that Congress explicitly protected through the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), 16 U.S.C. §§ 1331-1340.

4. AWHC also prepares alerts on these agency actions to notify interested citizens about the opportunity to comment on BLM management decisions affecting wild horses. Since 2010, by issuing alerts, AWHC has generated over 137,000 public comments on BLM management actions in Wyoming affecting wild horses. In addition, AWHC uses the information published by federal government agencies as a result of these administrative processes in its campaigns, advocacy efforts, and public education of how wild horses are being managed in particular areas.

5. For years, AWHC has been involved in the unrelenting battle between those pushing to use public lands to graze cattle and those wishing to preserve federally protected wild

horses' place on the range. In its efforts to ensure wild horses remain protected on our western public lands, as Congress intended when it unanimously passed the 1971 Wild Horse Act, AWHC constantly monitors government agency decisions that affect wild horses, including decisions authorizing roundups, and advocates for additional financial resources and protection for wild horses.

6. In order to safeguard its aesthetic, recreational, educational, photographic, and other interests in protecting the wild horses on public lands, AWHC has previously filed litigation over management (or mismanagement) of wild horses in Wyoming on several prior occasions, *see, e.g.*, *Am. Wild Horse Pres. Campaign v. Jewell*, 14-cv-0152, (D. Wyo. Aug. 28, 2014), including multiple cases concerning BLM actions affecting the Checkerboard's wild horse herds, *see Am. Wild Horse Pres. Campaign v. Salazar*, 800 F. Supp. 2d 270 (D.D.C. 2011); *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174 (10th Cir. 2016). AWHC has also intervened in litigation concerning the Checkerboard to ensure that AWHC's interests are adequately represented. For example, AWHC led a coalition of individuals and organizations that intervened in *Rock Springs Grazing Association v. Salazar*, 935 F. Supp. 2d 1179 (D. Wyo. 2013). More recently, AWHC intervened in a related case now pending before the Court regarding Checkerboard horses, *see* Order Granting Unopposed Motion to Intervene as Respondents, *Rock Springs Grazing Ass'n v. Salazar*, 2:23-cv-00048-NDF (D. Wyo. June 23, 13).

7. AWHC maintains that, if implemented, the BLM decisions challenged in this case—i.e., amendments to the portions of the Resource Management Plans concerning wild horse management for both the Green River and Rawlins Field Offices ("Amendments")—will substantially impair its interests in preserving and protecting wild free-roaming horses both

within the state of Wyoming and elsewhere. As discussed in greater detail in Petitioners' Opening Merits Brief, the Amendments are stunning in terms of their scope and their potential to have a precedential impact on wild horse management throughout the West. The Amendments call for the permanent eradication of 1,017-1,229 wild horses from areas of public land where wild horses have roamed since at least 1971, when Congress decided to protect these animals with substantive, permanent safeguards enacted through the Wild Horse Act. In reaching that conclusion, however, BLM failed to make the prerequisite findings required under the Act: that there exists an overpopulation and removal is necessary to restore a "thriving natural ecological balance"—a concept that BLM has tied to the abundance of four different features of wild horse habitat in a given area. In fact, BLM has found the opposite—that there is no such excess and the areas contain sufficient habitat to support the current herd sizes at a "thriving natural ecological balance." To justify eliminating and/or severely reducing the numbers of these herds, BLM instead relied on the proximity of BLM lands to private parcels, the tendency of wild horses to roam freely, the duty Section 4 of the Wild Horse Act imposes on BLM to promptly remove strayed animals from private land, and the administrative burden that all these things combined portend for BLM if the removals do not occur.

8.     If affirmed, the Amendments' substantive interpretation of BLM's authority to redesignate HMAs and remove wild horses based on those animals' proximity to private land would set a dangerous precedent for wild horse management throughout the country. Looking at the places where wild horses protected by the Act are found today—and based on my firsthand knowledge of those places and the historic movement of wild horses in those areas—I can see that there are very few places where it is impossible for horses to wander off public lands onto private lands. If a preemptive concern about private lands and BLM's duty under Section 4 were

a lawful basis to eliminate wild horses from large swaths of contiguous public land (just as BLM has done here in the non-Checkerboard portions of the planning area), based on my many years of interacting with BLM decisionmakers, I have no doubt that BLM would begin using this tactic to permanently eliminate many wild horse HMAs given that essentially every HMA either contains private inholdings or is surrounded by private or other non-federal land. This terrible precedent (which is certainly *not* what Congress intended when it enacted the Wild Horse Act) would negatively impact AWHC's campaigns and programs because it is directly contrary to AWHC's goals of finding ways to preserve wild horses and burros in their natural habitats by humanely managing them on the range and preventing wild horses from being captured and removed from their habitat.

9. BLM's decision here to remove thousands of wild horses from the public lands within and adjacent to the Checkerboard directly harms AWHC's organizational interests and the interests of its coalition partners and supporters in protecting and preserving viable free-roaming herds of wild horses on public lands, and their aesthetic interests in observing and photographing wild horses engaging in their natural behaviors.

10. The Environmental Impact Statement ("EIS") prepared by BLM pursuant to the National Environmental Policy Act also harms the informational and other interests of AWHC. BLM's failure to comply with the applicable NEPA requirements, including its failure to consider alternatives (like a land exchange to consolidate public lands in the Checkerboard) harms AWHC by denying us access to statutorily required information concerning the relative environmental effects of permanently removing thousands of wild horses from the Checkerboard lands versus other, less damaging options that could meet BLM's stated purpose and need.

11. A court order vacating the RMP Amendments, ROD, and Final EIS and requiring the agency to comply with the Wild Horse Act and NEPA would remedy the injuries caused by BLM and its unlawful amendments to the Green River and Rawlins RMPs by protecting from imminent elimination the longstanding wild horse herds in the Great Divide Basin and Salt Wells Creek HMAs, and from the imminent removal of hundreds of horses in the Adobe Town HMA. This would allow AWHC supporters to continue to observe and otherwise enjoy these specific wild horses and their specific herds on these public lands.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*Suzanne Roy*

_____
Suzanne Roy

Dated: __January 8, 2024_____